IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    vs.<br><br>$48,100.00 IN UNITED STATES<br>CURRENCY,<br><br>               Defendant. | **8:10CV110**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on the plaintiff United States of America's complaint for forfeiture of $48,100.00 in United States Currency (the "Currency"). (Filing No. 1).  Claimant John R. Nelson filed an answer seeking dismissal of the case, asserting the United States cannot demonstrate that the Currency was used or was intended to be used to facilitate a drug transaction.  (Filings No. 9 & 10).  A bench trial was held before the undersigned on August 20, 2012 and the parties submitted post-trial briefs in support of their respective positions.  For the reasons set forth below, the Defendant property shall be forfeited to the government.

BACKGROUND

On Monday, October 19, 2009, at approximately 11:00 a.m., Nebraska State Patrol Trooper Robert Pelster conducted a traffic stop of a recreational vehicle ("RV") driven by John R. Nelson ("John R.").  Trooper Pelster approached the RV and knocked on the side door.  John R. exited the vehicle and closed the door behind him.  Pelster informed John R. that he initiated the traffic stop because he observed the RV failing to maintain a safe following distance from the car in front of it.  Pelster asked John R. where he was coming from and John R. indicated that he had been in Colorado.  Pelster then instructed John R. to sit in the front of Pelster's vehicle while Pelster reviewed John R.'s license and the RV's registration.

While processing John R.'s license and registration, Pelster initiated a conversation with John R. about his travels to Colorado. Through the course of the conversation John R. stated the following:

- He was traveling in an RV owned by his parents and borrowed with their permission;

- His trip originated in his home town of Cedarburg, Wisconsin – a suburb of Milwaukee;

- He visited Denver and Boulder, Colorado to snowboard with some friends;

- John R. had been traveling for a few weeks and was returning to his home in Cedarburg;

- His only previous criminal history was a charge of disorderly conduct which had been resolved;

- He did not have any drugs or guns in the RV.

Trooper Pelster testified that many of John R.'s responses caused him to be suspicious that John R. was being dishonest and, considered in the totality, were indicative of criminal activity. For instance, Trooper Pelster did not believe John R. had been snowboarding because, as an avid skier himself, Trooper Pelster believed that the ski season did not begin until November 1st. Further, Trooper Pelster was unaware of any place in Boulder where John R. could have been snowboarding. Trooper Pelster also testified John R. appeared unusually nervous throughout the traffic stop.

After Trooper Pelster issued John R. a warning citation, he asked John R. if he would be willing to answer a few more questions. John R. agreed to do so. Trooper Pelster asked John R. if he was transporting any illegal drugs or guns in the RV. John R. responded that he was not. Trooper Pelster then asked John R. for permission to search

2

the RV, or in the alternative, allow a police dog to conduct a sniff for drugs on the outside of the vehicle.  John R. declined, stating that he was anxious to recommence his travel home.  Trooper Pelster informed John R. that he would be detained while Trooper Pelster called in a canine unit to conduct the drug sniff.

While waiting for the canine unit to arrive, Trooper Pelster continued talking with John R.  Trooper Pelster mentioned that if John R. had any recreational use marijuana in the RV, he would be subject to only a fine.  John R. then volunteered that he had a small amount of marijuana for his personal use in the RV.  Trooper Pelster informed him that his admission of possessing marijuana provided Trooper Pelster with probable cause to search the inside of the RV.

Trooper Pelster called additional law enforcement officers to help him search the RV. In addition to the recreational marijuana and a jar of medicinal marijuana, Trooper Pelster found a marijuana pipe, a marijuana grinder, and a backpack which contained a plastic bag holding the Currency.  The Currency was found in a single bundle and wrapped with rubber bands.  Trooper Pelster and another law enforcement officer continued to search the RV, but found no additional contraband or currency.

When Trooper Pelster informed John R. that he found the bundled money, John R. stated he had approximately $50,000 in cash that represented his life savings.  John R. further stated that he was carrying the cash with him because he intended to move to Colorado and was going to live off of that money while in Colorado and use it to "pay for college and stuff."  When Trooper Pelster told him that he believed the money was connected to drug trafficking, John R. further stated that "he could have bought weed [while in Colorado] but that is not what he was doing."  Trooper Pelster questioned John R. regarding the origin of the money.  John R. explained that it was from bonds he was given by his grandmother and said he could produce receipts.

3

John R. was detained and taken to the Nebraska State Patrol headquarters in Lincoln, Nebraska where he was questioned.  John R. again stated that the money was from his grandmother and other legitimate sources.  He eventually elected not to answer further questions and was released with a citation for possessing marijuana.  Law enforcement officials seized the Currency.

## LEGAL ANALYSIS

The United States alleges that the Currency is subject to forfeiture under 21 U.S.C. § 881(a)(6), which states:

> The following property shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6)  All monies, . . . furnished or intended to be furnished by any person in exchange for controlled substance . . ., all proceeds traceable to such an exchange, and all monies, . . . used or intended to be used to facilitate any violation of [controlled substances used in violation of Title 21].

21 U.S.C. § 881(a)(6).   In a forfeiture action, the government has the burden of establishing by a preponderance of the evidence that the seized property is substantially connected to drug trafficking.  18 U.S.C. § 983(c)(1) & (3).  Circumstantial evidence can be used to establish the burden of proof.  United States v. $84,615 in U.S. Currency, 379 F.3d 496, 501 (8th Cir. 2004).  The government does not necessarily have to show a connection between the seized property and a specific drug transaction in order to meet its burden of proof.  United States v. $150,660.00 in U.S. Currency, 980 F.2d 1200, 1205 (8th Cir. 1992).

The Eighth Circuit has "adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking."  United

States v. 124,7000 in U.S. Currency, 458 F.3d 822, 826 (2006) (internal citations omitted).   Suspicious circumstances have been found to include money wrapped in rubber bands, concealment of the money, a claimant's dishonesty about the existence of the currency or providing an untruthful story, and a claimant traveling on a known drug distribution route.  See, e.g., United States v. $117,920.00 in U.S. Currency, 413 F.3d 826 (8th Cir. 2005) (seized money found hidden beneath clothing, wrapped in a plastic sack, and in a piece of luggage and evidence of concealment by the claimant); United States v. $141,770.00 in U.S. Currency, 157 F.3d 600 (8th Cir. 1998) ("[T]he government presented evidence that the camper had originated in California, a drug source state, and was on its way back to California with a very large amount of cash after having spent the time in the upper Midwest, a drug destination area."); United States v. $12,390.00 in U.S. Currency, 956 F.2d 801 (8th Cir. 1992) (noting that currency wrapped in rubber bands was characteristic of the way drug money is stored).

In this case, a number of the "suspicious factors" identified by the Eighth Circuit are present.  The video of John R.'s traffic stop and subsequent interview confirm Trooper Pelster's credible testimony that John R. was visibly nervous and provided untruthful and inconsistent responses to Trooper Pelster's questions.  Specifically, John R. stated that he was in Colorado to snowboard with friends, had no criminal history involving drugs, and did not have any illegal drugs in the RV.  None of those statements were true.  By his own admission, John R. was not in Colorado snowboarding, but went to Colorado to relocate and was staying in the RV until he found a new place to live.  A search of his background revealed previous criminal activity involving illegal drugs despite his denial of such activity.  And a search of the RV revealed that John R. did have illegal contraband in his possession.

Moreover, the Currency was found in a plastic bag within John R.'s backpack and was bundled together with rubber bands.  As Pelster testified, this method of transport

and storage is often associated with money used for drug trafficking. See United States v. $242,484.00 in U.S. Currency, 389 F.3d 1149, 1161 (11th Cir. 2004). John R.'s testimony that he felt the backpack was more secure and would draw less attention to the money than his small black safe is contrary to common sense and was not entirely credible.

The government further asserts the RV was stopped on a drug trafficking route. Specifically, the RV was leaving a drug source area – Colorado – and returning to a common destination – an area adjacent to Milwaukee. The Claimant counters that this evidence is of little or no value in this case: The government speculates that John R. likely took the money to Colorado to buy illegal contraband, but the transaction was not completed. There is no evidence of a failed drug transaction other than the fact that John R. possessed a small amount of marijuana in the RV with the Currency.

The claimant's father, John A. Nelson ("John A."), testified as follows:

- The source of the Currency was legitimate and the Currency represented John R.'s life savings;
- John R. seldom, if ever, used banks and kept the Currency in a small safe in his parents' basement;
- John R. was using the RV with his parents' permission;
- John R. had told his father that the trip to Colorado was intended to be a relocation for John R. and the Currency was going to be used to help John R. find a place to live and pay living expenses;
- John A. provided John R. with approximately $4,000 just before the trip to ensure John R. had enough money to "see him through while he was out there;"

6

- John R. has received mental health treatment since November of 2003 and has been on medication since that time – corroborating John R.'s testimony that he has been under treatment for anxiety and depression since that time;

- John R. told his father that he returned home from Colorado because he was having difficulty with the RV and because the city of Denver has a prohibition on the ownership of pit bull dogs – the type of dog John R. owns and took with him to Colorado.

John A.'s testimony was very credible, but as to his son's real motivation for traveling to Colorado, John A. can only repeat what his son told him.  Ultimately, the court has to decide if John R. was telling the truth.  It is a close question, particularly since the officer never asked, and therefore John R. never lied about the existence of large amounts of currency in the RV.[1]

John A.'s testimony provides a plausible and credible explanation for John R.'s visible nervousness during the initial stop and questioning.  Nervous mannerisms would be expected from an individual who is being treated for an anxiety disorder--particularly if the person has marijuana in his vehicle, is alone and at least 500 miles from home, and is now being questioned by law enforcement.[2]  And John A. credibly verified that his son seldom used banks and kept his savings in cash.  Assuming John R. was traveling to Colorado to relocate, based on his father's testimony, it is certainly reasonable that he would – consistent with his history of handling money – carry the cash with him rather than use credit cards or wire transfers to pay for the relocation.

---

[1] Cf. U.S. v. $117,920, 413 F.3d at 827 (claimant denied having large amounts of U.S. currency with him); U.S. v. 124,000, 458 F.3d at 826 (claimant lied when directly questioned about whether he had money in his vehicle).

[2] John R. apparently received a citation for being in possession of the illegal contraband, but the court has no knowledge of how that issue was ultimately resolved.

But initially, John R. did not tell Trooper Pelster that the origin reason for his trip was to move to Colorado – the plan thereafter thwarted by Colorado's ban on pit bulls. Instead, John R. stated he went to Colorado to snowboard with friends.  If moving was the true reason for the trip, there was no reason to hide it from the officer.  The relocation explanation was advanced by John R. only after the cash was found.  By then, John R. had time to think, retract his original response, and proffer a new one – a rather consistent hallmark of an untruthful statement.  Simply stated, as is common in many forfeiture cases, when asked to explain the large amount of cash, John R. struggled to find a plausible explanation.  See, e.g., U.S. v. $124,000, 458 F.3d at 826 (claimant alleged he was carrying $124,000 in cash to buy a truck he had never seen and to help a friend whose name he did not know).

Considering the evidence in the totality, the court is convinced that John R. told his father he was moving to Colorado, thereby explaining why he was taking all his cash, his pit bull, his parents' RV, and whatever additional money his father chose to provide on a road trip from Wisconsin to Colorado.  But the court is not convinced that was the true purpose for the trip.  Rather, based on the totality of the information, the court believes John R. took his life savings, and the additional financial assistance provided by his father, to Colorado to engage illegal drug sales, likely with the hope of returning to Wisconsin with a supply for distribution at a profit.

The court finds the claimant the Currency was used or intended for use in illegal drug transactions.  The money must be forfeited to the government.

Accordingly,

8

IT IS ORDERED,

1.      The claim of John R. Nelson against defendant $48,100 in U.S. Currency, (Filing No. 9) is denied and dismissed.

2.      Judgment will be entered in accordance with this memorandum and order.

Dated this 16th day of January, 2013.

                                        BY THE COURT:

                                        *s/ Cheryl R. Zwart*
                                        United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.